William A. Markham, California State Bar No. 132970
*wm@markhamlawfirm.com*
Dorn Bishop, California State Bar No. 147994
*db@markhamlawfirm.com*
Jason Eliaser, California State Bar No. 248394
*je@markhamlawfirm.com*
LAW OFFICES OF WILLIAM MARKHAM, P.C.
550 West C Street, Suite 2000
San Diego, CA 92101
Tel: 619.221.4400

Ronald Marron, California State Bar No. 175650
*ron@consumersadvocates.com*
Michael Houchin, California State Bar No. 305541
*mike@consumersadvocates.com*
LAW OFFICES OF RONALD A. MARRON, P.C.
651 Arroyo Drive
San Diego, CA 92103
Tel: 619.696.9006

*Attorneys for Plaintiff and the Proposed Class*

# UNITED STATES DISTRICT COURT

## NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| PAM STILLINGS, on behalf of herself and all others similarly situated, <br><br> Plaintiff, <br><br> vs. <br><br> 1-800-CONTACTS, INC. <br><br> Defendant. | Case No: 3:16-cv-5400 <br><br> PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE IN VIOLATION OF 15 U.S.C. § 1 <br><br> PRAYER FOR RELIEF <br><br> DEMAND OF JURY TRIAL <br><br> PROPOSED CLASS-ACTION UNDER FED. R. CIV. P. 23 |

## I. CONCISE STATEMENT OF THE CASE (FED. R. CIV. P. 8)

Plaintiff is a proposed representative of a putative class of purchasers who within the past four years purchased contact lenses online from Defendant, 1-800-Contacts, Inc. ("800-Contacts"). 800-Contacts overcharged Plaintiff and each member of the proposed class of purchasers by charging supracompetitive prices for the contact lenses that it sold to them. 800-Contacts was able to charge these prices only by restraining and suppressing competition for the online sale of contact lenses in the United States; otherwise, it would have been constrained to charge competitive prices for its above sales of contact lenses to Plaintiff and all other members of the putative class.

The specific trade restraints in question are a series of bilateral agreements that 800-Contacts made with fourteen of its direct competitors, which on information and belief 800-Contacts continues to enforce. These agreements, as enforced, have unlawfully restrained trade in violation of Section 1 of the Sherman Act, which is codified at 15 U.S.C. § 1 ("Section 1"). More specifically, these agreements have restrained trade as follows: (1) they have established an unlawful, ongoing bid-rigging conspiracy among direct competitors to rig their bids for search-engine advertising; (2) they have established an unlawful, ongoing conspiracy among direct competitors to allocate online sales according to pre-defined internet search queries; and (3) they have established an unlawful, ongoing conspiracy among direct competitors to suppress their advertising and the dissemination of information about their products and offers.

To challenge these matters, Plaintiff now asserts a single cause of action against 800-Contacts for employing unlawful restraints of trade in violation of Section 1, and she brings this claim on behalf of herself and all other members of her proposed class of purchasers.

As demonstrated by the Federal Trade Commission in its recently filed administrative complaint, 800-Contacts used improper coercion to oblige fourteen of

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-1-

its direct competitors to accept identical or similarly worded bilateral agreements with it. The principal provisions of these agreements constitute *per se* violations of Section 1 and favor 800-Contacts at the expense of its rivals. 800-Contacts was the instigator and has been the primary beneficiary of these anticompetitive agreements.

800-Contacts prevailed on its rivals to assent to its agreements by threatening to bring objectively baseless claims against them for trademark infringement unless they did so. With one exception, each of 800-Contacts' rivals ceded in response to this threat. The one rival that refused to yield was obliged to defend itself against an objectively baseless litigation that 800-Contacts litigated with zeal in order to send a message to its other rivals and to punish the hold-out rival with costly, prolonged litigation. Foreseeably, 800-Contacts lost on the merits in this litigation at summary judgment and then again on appeal, but the litigation served its intended purpose of intimidating its rivals, disrupting their operations, and pressuring fourteen of them to assent or maintain their assent to its anticompetitive bilateral agreements.

800-Contacts' agreements with its direct competitors established a coordinated bid-rigging conspiracy, an elaborate market-allocation scheme, and a related scheme to suppress advertising and the dissemination of information about the online sale of contact lenses. These agreements constitute trade restraints made between direct competitors that are unlawful under Section 1 under all three applicable standards of review: (1) the *per se* standard, which governs bid-rigging and the allocation of markets by horizontal agreement; (2) the quick-look standard, which governs apparently anticompetitive schemes with which the courts lack familiarity; and (3) the rule-of-reason standard (the "Rule of Reason"), which governs all other challenged restraints of trade.

Plaintiff respectfully submits that the Court should apply well-recognized *per se* rules in order to condemn the challenged trade restraints, but in an abundance of caution she has pled her claim in the alternative so that it is raised not only under the *per se* rules, but also under the quick-look standard and the Rule of Reason.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-2-

Plaintiff is an individual who during the past four years overpaid for contact lenses that she purchased from 800-Contacts because of its imposition of unlawful restraints of trade. She was also deprived of a meaningful choice between alternative products and services because of 800-Contact's restraints of trade. She proposes to serve as the named representative of a class of persons who purchased contact lenses from 800-Contacts during the last four years, and who overpaid for these purchases and were deprived of alternative offerings because of 800-Contacts' imposition of unlawful restraints of trade. If 800-Contacts had not employed the trade restraints that Plaintiff now challenges, it would not have been able to overcharge Plaintiff or the other class members and would not have done so. Plaintiff now seeks certification of the proposed class and all relief that the law affords to this class.

## II. THE PARTIES

1.      Plaintiff, Pam Stillings, is an individual who maintains her domicile in Contra Costa County, California.

2.      Defendant, 1-800-Contacts, Inc. ("800-Contacts"), is a corporation formed under the laws of the United States that maintains its headquarters in Draper, Utah.

## III.  JURISDICTION AND VENUE

3.      **Subject-Matter Jurisdiction**. Plaintiff's sole cause of action arises under Section 1 – *i.e.*, Section 1 of the Sherman Act, which is codified at 15 U.S.C. § 1. On the basis of this claim, Plaintiff seeks damages under Section 4 of the Clayton Act, which is codified at 15 U.S.C. § 15, as well as injunctive relief under 15 U.S.C. § 26. This Court has original and exclusive subject-matter jurisdiction over Plaintiff's claim under Section 4 of the Clayton Act, and therefore it also has subject-matter jurisdiction over Plaintiff's claim under 28 U.S.C. § 1331 (vesting all federal district courts with original jurisdiction over any claim that arises under a statute of the United States).

//

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

4.    **Personal Jurisdiction**. This Court has personal jurisdiction over 800-Contacts under 15 U.S.C. §§ 15 and 22 because 800-Contacts conducts business in the Northern District of California and otherwise can be "found" in this judicial district.

5.    **Venue**. This Court is the proper venue for the present action because (1) 800-Contacts conducts substantial commerce in this judicial district; (2) 800-Contacts has engaged in the challenged conduct and employed the challenged trade restraints in this judicial district; (3) Plaintiff purchased contact lenses from 800-Contacts within the past four years while residing in this judicial district; (4) 800-Contacts overcharged Plaintiff, deprived her of alternative offerings, and delivered contact lenses to her in this judicial district; and (5) Plaintiff suffered antitrust injury in this judicial district because of 800-Contacts' challenged conduct.

## IV. COMMON ALLEGATIONS

6.    Plaintiff re-pleads and incorporates by reference each of the preceding allegations.

7.    **Market Definitions Are Unnecessary.** Plaintiff's claim arises from 800-Contacts' *per se* violations of Section 1 – namely, its organization and enforcement of a bid-rigging conspiracy and its further organization of a horizontal market-allocation scheme. In an abundance of caution, however, Plaintiff has alleged the relevant markets at issue and has pled how 800-Contacts' conduct has harmed competitive processes in these markets.

8.    **The Relevant Markets at Issue**. The relevant markets in which 800-Contacts has committed antitrust offenses are as follows: (1) the market for the sale of contact lenses in the United States as well as a submarket for the online sale of contact lenses in the United States (collectively, the "contact lens markets"); and (2) the market for search-engine advertising in the United States. Plaintiff and all members of the proposed class are consumers in each of these markets.

//

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

9.      **Contact Lenses Constitute a Relevant Product Market.** Contact lenses are medical devices used to improve vision, treat defective vision, and/or improve the physical appearance of the user. For purposes of antitrust review, contact lenses constitute a relevant category of products whose sale 800-Contacts has unlawfully restrained.

10.     A contact lens is composed of specialized material and encased in a special film. It is thin, curved, naturally clear, and specially shaped in order to be placed onto a human eye. Contact lenses are sold in pairs and placed directly on the surface of a user's eyes in order to correct or improve the user's vision or for cosmetic reasons, such as changing the apparent hue and shape of the user's eyes.

11.     Most consumers who purchase contact lenses use them for the same reason that others wear eye-glasses – to correct a vision impairment. For many users, however, contact lenses and eye-glasses are *not* reasonably interchangeable substitutes for one another because of the below-pled circumstances.

12.     Many users strongly prefer contact lenses to eye-glasses because contact lenses correct or improve their vision without burdening them with the perceived disadvantages of wearing eye-glasses – their appearance and imposition of discomfort. Many users of contact lenses dislike how eye-glasses make them appear to others and/or find eye-glasses to be uncomfortable or awkward to wear.

13.     Many users of contact lenses also dislike how eye-glasses readily accumulate dust, moisture and/or perspiration.

14.     Many users of contact lenses find that eye-glasses are ill-suited or unsuitable for use when they participate in sporting activities, other outdoor activities or activities that require robust physical exertion.

15.     Contact lenses also afford better peripheral vision than do most kinds of eye-glasses.

16.     In addition, some users wear contact lenses only for cosmetic reasons rather than to correct any vision impairment. These users wear contact lenses only in

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-5-

order to alter the apparent hue (color) of their eyes or to give a different apparent shape to their eyes. Many users of contact lenses report that wearing them makes them feel much more physically attractive, and many who wear them to correct a vision impairment also do so for cosmetic reasons.

17.    Some users of contact lenses wear them so that they can also wear sunglasses, goggles or other kinds of eye-wear without having special fittings placed on eye-glasses.

18.    For all of the foregoing reasons, contact lenses are medical devices for which there is no reasonably interchangeable substitute product. There is only one other product – eye-glasses – that in some cases can perform only some of the same functions. But owing to the above matters, those who wear contact lenses have such a strong preference for them that they would not stop wearing them and would not switch to eye-glasses even if the prices for contact lenses were to increase by a statistically significant amount for a non-transitory duration, which in antitrust jurisprudence is known as a "SSNIP" – a statistically significant, non-transitory increase in price. Rather, most users of contact lenses would continue to purchase and use them even if their price were increased by a SSNIP – a circumstance that means that contact lenses constitute a distinct relevant product according to the current Horizontal Merger Guidelines used by the United States Department of Justice for purposes of establishing the relevant product market in antitrust cases (*i.e.*, determining the relevant category of products at issue for purposes of performing an antitrust evaluation of the practices challenged under the antitrust laws).

19.    For many users, switching from contact lenses to eye-glasses is not even an option at any price, since they use contact lenses for purposes that eye-glasses cannot fulfill, such as cosmetic uses or the use of corrective lenses at sporting events.

20.    By and large, there is either very limited or no cross-elasticity of demand between contact lenses and eye-glasses, and there is no cross-elasticity of demand at all between contact lenses and any other product. For most users of contact lenses,

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-6-

eye-glasses are not reasonably interchangeable substitute products because they do not afford the singular advantages offered only by contact lenses. For these users, there exists a distinct category of products that is limited to the various kinds and brands of contact lenses.

21.    Sellers of contact lenses set their prices after carefully considering what other sellers of them charge, and they pay only passing attention to the prices charged for eye-glasses, since the two categories of products are not directly in competition with one another for most sales.

22.    Manufacturers of contact lenses, distributors, online sellers, brick-and-mortar retailers, consumers and industry experts regard the sale of contact lenses in the United States as a distinct category of sales. The sale of these products is characterized by distinct demand curves, specialized manufacturers, specialized distribution channels, specialized retailers, distinct customers, and distinct uses.

23.    For purposes of the present antitrust review, contact lenses constitute the relevant product market. It would be inappropriate to include any other product in the relevant product market when conducting an antitrust review of the business practices placed in issue by the present complaint.

24.    **Contact Lenses Are Sold in a National Market**. The manufacturers of contact lenses market their products for distribution in the United States. They sell their products directly to specialized wholesale distributors, retailers, health-care purchasing organizations, healthcare providers, and others.

25.    Defendant, 800-Contacts, is an online retailer that sells contact lenses online to customers located across the United States. All other online retailers of contact lenses likewise make sales to customers located across the United States. Online retailers face competition from one another and from brick-and-mortar retailers that make sales in localities and regions within the United States.

26.    For purposes of evaluating Plaintiff's present antitrust challenge, the relevant geographic market for the sale of contact lenses cannot be larger than the

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

United States. In the United States, contact lenses are regulated as medical devices by the United States Food and Drug Administration, which imposes special regulatory requirements on their manufacture, distribution and sale that are not imposed on contact lenses that are made, distributed or sold abroad. In addition, in the United States contact lenses are sold in distinct "sales channels" that are not used to sell these products in any other region of the world.

27.     The geographic market for contact lenses is therefore no larger than the United States.

28.     **How Contact Lenses Are Sold in the United States.** In the United States, experts estimate that slightly more than forty million adults wear contact lenses, or approximately 16.7% of the adult population of the United States (an adult is defined as someone who is age eighteen or older). In addition, approximately four million adolescents and children also wear contact lenses.

29.     Industry experts estimate that sales of contact lenses in the United States in 2015 generated revenues of approximately $2.7 billion.

30.     Users of contact lenses replace them at periodic intervals, such as once per year, once per month, once every other week, once every week, or once every day. Many users prefer disposable contact lenses and replace them every day. Most users replace their contact lenses at least once every month or at shorter intervals.

31.     Many users originally purchase contact lenses directly from a health-care provider, such as an optometrist, optician, contact lens technician or ophthalmologist. These health-care providers help users to determine which size and type of contact lens are best suited to their particular requirements and help them to place the lenses on the users' eyes. Many users make their own purchases directly from online sellers and/or brick-and-mortar retailers after receiving initial fittings from health-care providers.

32.     **The Submarket for Online Sales of Contact Lenses in the United States.** Like many other goods, contact lenses are increasingly advertised and sold

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

over the internet rather than in brick-and-mortar stores: in the United States, health-care providers, specialized distributors of medical devices, and users by the millions browse online to consider and shop for contact lenses, place online orders, make online payment arrangements, and have specified contact lenses delivered to them by online sellers.

33.     In the United States, online sales of contact lenses constituted 16.7% of all sales of contact lenses in 2012 (the most recent date for which Plaintiff has this information). The percentage of these sales made online has since increased.

34.     For purposes of antitrust review, there exists a distinct submarket for the online sale of contact lenses in the United States. In this submarket, there are specialized sellers, distribution channels, logistics, promotional strategies, demand curves, and prices, and there exist a distinct subset of customers – the healthcare providers, medical device suppliers and especially the consumers who look only to online sellers in order to purchase contact lenses. There is widespread recognition among all of these market participants that the online sale of contact lenses has become a distinct market or submarket within a larger market for the sale of contact lenses in the United States.

35.     **Online Sales, Generally Described.** An online sale is one that is made on the internet. It is typically conducted at the website of an online seller, which, crucially, *serves as the online seller's point of sale – i.e., its store*. It is the place where an online seller shows and promotes its products and concludes sales.

36.     In a typical transaction, a customer visits an online seller's website, reviews information about the seller's products, and, if persuaded to make a purchase, makes a purchase by placing an order, providing an electronic payment, and providing delivery instructions. After confirming the payment, the seller arranges to have the products delivered to the customer's designated location. The entire transaction is conducted online and electronically, except for the physical delivery of the products (which is a separate operation that also depends on the use of online

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-9-

1    logistics). This is the typical manner in which online sales are conducted.

2    37.    To make sales, an online seller hosts a website that provides information
3    about its products and processes final sales.

4    38.    To attract prospective customers to its website (*i.e.*, to its store), an
5    online seller strives to make its website attractive, useful, informative,
6    accommodating, and as noticeable as possible.

7    39.    To this end, a proficient online seller continually strives to create and
8    maintain a website that internet search engines such as Google and Bing will list in
9    the internet search findings that they offer in response to users' search queries.
10   Without having customers steered to its website by internet search engines, an online
11   seller would largely lack customers and therefore could not make sales. Without the
12   steering, most prospective customers would never come across its website at all.

13   40.    Stated the other way around, internet search engines help to steer
14   customers to online stores where they can find the goods and services that they seek.
15   For example, if a user runs a query for "contact lenses, online," a search engine such
16   as Google or Bing will list in order of "relevance" various websites that it determines
17   offer relevant information in response to the search query, such as the websites of
18   various online sellers of contact lenses. An online seller of contact lenses will
19   therefore strive to create and maintain a website that will be prominently listed in
20   response to any such search query.

21   41.    An online seller can reach prospective customers simply by hosting a
22   useful, informative website. When a prospective customer runs a search query in a
23   search engine about a topic on which the seller's website offers useful information,
24   the search engine might list the website as one of its findings. Users will be thereby
25   directed to the online seller's website.

26   42.    Many online sellers, however, are not content merely to develop
27   informative websites and do not limit their promotional efforts to the simple hosting
28   of a website. In addition, they pay for advertising, whose purpose is to provide

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

information about their products and especially to attract users to their websites.

43.    To this end, an online seller can pay to run a "banner ad" on popular websites, so that all visitors to the popular websites will see the advertisement and possibly clink on an embedded link within the advertisement in order to visit seller's website. Yahoo.com is one popular website that sells and displays such "banner ads."

44.    An online seller can also run advertisements in traditional media, such as newspapers, magazines, broadcast and cable television, and broadcast radio: the advertisements can tout the online seller's products and identify and promote its website ("visit our crazy website at wow dot com!")

45.    By far the most effective advertising for an online seller is search-engine advertising, which is specifically targeted to users who see the seller's advertisement at the very time when they are likely looking for the products or services that the seller offers. Search-engine advertising is run alongside internet search results that internet search engines provide in response to internet users' search queries.

46.    Specifically, an online seller can pay for advertising that will only appear alongside search findings that a search engine gives in response to designated search queries. Online sellers pay search engines such as Google or Bing to run their advertisements in this manner. By this means, an online seller can specifically target its advertising to prospective customers rather than the public at large.

47.    Ultimately, the aim of all advertising run by online sellers is to promote their goods or services to customers and to attract customers to their websites. The most effective advertising for this purpose is the search-engine advertising that the online sellers pay search engines to place alongside search results that the search engines give in response to specified search queries.

48.    **Online Search Engines**. Online search engines act as private curators of the extraordinary if not inconceivable volume of information available to internet users on the "worldwide web" of internet connections.

//

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-11-

49.     Using extraordinary resources that include state-of-the-art computer programs, an internet search engine continually combs over and organizes in myriad ways all of the available information in the worldwide web. It is then able to guide an internet user who uses its search-engine facilities to find specific information located in the worldwide web. For example, if a user seeks information on the internet about whether peanuts are healthy food, she can hazard the names of likely websites that might exist and provide such information (e.g., "peanuts.com") or she can go to a search engine such as google and run an appropriate search query (e.g., "are peanuts good for you?"). Google will then list various websites that it believes will provide the requested information along with hyperlinks to these websites, so that the user can effortlessly proceed to them.

50.     It is the search engines that in this manner organize the information available on the worldwide web, making it practically accessible to internet users. Without this service, it would be exceedingly difficult or impossible for an internet user to find relevant information on the worldwide web: an internet user who lacks a search engine would be akin to a person who finds herself inside a vast library building that holds millions of books that are not catalogued or placed in any particular order. Indeed, an internet user without a search engine would be at even a greater disadvantage than our hapless library visitor in the foregoing example. Search engines therefore perform an indispensable service that is principally funded by the search-engine advertising that they sell to online sellers.

51.     Search engines use algorithms to perform their essential work. When an internet user enters a search query in the search engine, the search engine responds by running highly complex algorithms to direct the user to the information in the worldwide web that it determines is most "relevant" to the user's query.

52.     Search engines are private entities that are funded by the search-engine advertising that they sell to online advertisers, who are principally online sellers. When a search engine provides a search result in response to a query, it typically will

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-12-

also display paid advertising alongside its search findings. It is this paid search-engine advertising that provides the principal source of revenues for the search engine, making possible its ability to provide internet search services, which are indispensable services in the modern era. The paid advertisements fund its activities – the providing of ordered search results in response to online search queries.

53. **Search-Engine Advertising**. Search engines sell their advertising principally to online sellers, and they make these sales by conducting ongoing online auctions, which operate as follows. Each search engine allows an advertiser to give it ongoing instructions as to when it wishes to have its advertisements run and how much it will pay for the privilege. To this end, the advertiser designates specific "keywords" and "negative keywords" as well as various other parameters. These keywords, negative keywords and other parameters serve as the advertiser's instructions to the search engine. These instructions are also accompanied by the advertiser's bidding information – its statement of how much it is willing to pay to have each of its advertisements run in response to qualifying search queries. These bids can be very complex, and the advertiser can change them constantly. For example, the advertiser might be willing to pay one amount for a query that contains three particular keywords and that is run in the evening where the user is located, but another price for a different query made at a different time of day, and so on and so forth.

54. The keywords, negative keywords and other parameters that online sellers provide to search engines serve as a set of instructions to them: "please run our advertisement whenever these criteria are met, and we will pay you as follows every time you run our advertisement." Online sellers accompany these instructions with complicated bids that indicate how much they will pay for every possible running of any of their advertisements. The search engines provide computer programs that greatly simplify and facilitate the online sellers' provision of this information.

//

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-13-

55.     A keyword is an instruction to run an advertisement in response to any internet search query that includes the keyword (e.g., "run our ad showing the smiling, healthy woman eating a slice of blueberry pie whenever the term 'pie' appears in a search query."). A negative keyword is an instruction not to run the advertisement if a negative keyword appears in a query that also includes a keyword (e.g., do not run our ad in any query that includes the word 'pizza,' even if it also includes any of our keywords.")

56.     For example, an online seller of cakes and pies might list as its keywords "cake," "pie," "batter," "flour," "chocolate" and "desert," and it might list as negative keywords "pizza" and "survival": it wants to show its advertisements to internet users who seek information about cakes, pies, after-dinner deserts and such matters, but not to users who seek information about pizza pies or surviving in the desert.

57.     An online seller will therefore instruct a search engine to run its specified advertisement in response to search queries that contain one or some combination of its keywords, but not to do so if the query also contains one or some combination of negative keywords. It will also likely provide other parameters, varying which advertisements it wishes to run according to what search is made, at what time of day, from which location, etc.

58.     When providing this information, an online seller will also provide its bidding for its advertisements, stating the highest price it is willing to pay to run a given advertisement in response to given internet queries.

59.     Each online search engine conducts permanent, ongoing evaluations of advertisers' instructions and bids, and it also considers how relevant each proposed advertisement will be to each specified search query. On this basis it decides (1) which paid advertisements it will run in response to each search query, and (2) the ordering of these paid advertisements.

60.     Typically, an online seller who is willing to pay the most for its advertising will have its advertisement displayed first, and each advertiser's

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-14-

advertisement will be displayed in order, according to how much each advertiser is willing to pay.

61.   **800-Contacts' Online Sales of Contact Lenses.** As pled above, contact lenses are increasingly sold by online sellers, who make most of their sales by using online advertisements to attract customers to their websites, at which they make their promotions and sales.

62.   800-Contacts was an innovative pioneer in online sales of contact lenses, and over time it became the largest online seller. It now makes approximately 50% of all online sales of contact lenses in the United States. It is the dominant seller in a distinct submarket for the sale of contact lenses in the United States – their online sale.

63.   Like all online sellers, 800-Contacts makes all of its sales from its website, which prospective customers visit in order to consider and possibly purchase its offerings.  Like most online sellers, 800-Contacts uses internet advertising to attract customers to its websites, and it uses search-engine advertising in order to target its advertising specifically at internet browsers who seek information about contact lenses.

64.   **800-Contacts' Rivals Tried to Compete Against It**. 800-Contacts' success naturally invited competition. Other sellers of contact lenses established competing websites and ran their own online advertisements in order to introduce their own online products. Some of these rivals claimed that their contact lenses were better in quality or specially adapted to particular niche uses. Some offered lower prices than those offered by 800-Contacts for the same goods. Some offered innovative terms of sale or other services that 800-Contacts did not offer.

65.   **800-Contacts Responded By Suppressing Competition**. Rather than respond to this competitive threat by striving to improve its products and lower its prices, *800-Contacts went to elaborate lengths to protect its "internet turf" from competition*.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

66.     To this end 800-Contacts circulated cease-and-desist letters to at least fifteen of its direct competitors that also sold contact lenses in the United States by means of online sales. In these cease-and-desist letters, 800-Contacts threatened to involve each of these business rivals in baseless trademark litigation that would be costly and disruptive, unless the rival assented to its proposed settlement agreement. Fourteen of the targeted rivals acquiesced and assented to its proposed settlement agreements, which included anticompetitive terms that constitute *per se* violations of Section 1. Plaintiff lacks the names of these fourteen rival sellers because the Federal Trade Commission, which has investigated this matter, has redacted them from the public version of its complaint, but Plaintiff will disclose these names after she has had occasion to conduct appropriate discovery in order to ascertain them.

67.     By these agreements, made in response to 800-Contacts' threat to initiate baseless litigation, 800-Contacts and the fourteen acquiescent direct competitors agreed by a series of bilateral agreements to do the following: (1) coordinate their bidding for search-engine advertising; (2) coordinate their competition and abstain from competing against one another for specified sales leads; and (3) coordinate and suppress their internet advertising and dissemination of information about their products and offers, so that only one online seller, usually 800-Contacts, would be permitted to show its advertising in response to specified sales leads.

68.     More specifically, 800-Contacts and each of the above fourteen rivals agreed that only 800-Contacts would submit bids to run search-engine advertisements in response to any search query that included the term "800-Contacts" or any of 800-Contacts other trademarks, and that none of the rivals would bid to run their own advertisements in response to any such search query. Similarly, 800-Contacts and each of these rivals agreed that 800-Contacts would not bid to run its advertisements in response to any search inquiry that included mention of the rival's name or any of its other trademarks. (Plaintiff does not know how 800-Contracts and its rivals agreed to handle search queries that included both 800-Contacts' name and a rival's name.)

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-16-

69.     800-Contacts and each of the above rivals further agreed that each would list the other's name and other trademarks as "negative keywords" in its instructions to search engines. If a customer included 800-Contacts' name or other trademarks in a search query, none of 800-Contacts' fourteen rivals would permit its advertising to appear in response to the query.

70.     Since online sellers make their sales by attracting internet users to their websites, these fourteen agreements constituted an effectual market-allocation scheme. Whenever a prospective customer ran a search query on the internet that made any mention of 800-Contacts' name or other trademarks, only 800-Contacts would bid to run advertisements, and only 800-Contacts would show its advertisements to the prospective customer. *For these sales leads, only 800-Contacts would try to make sales, and its above fourteen rivals expressly agreed to refrain from doing so*.

71.     The several agreements between 800-Contacts and its fourteen rivals concerning bids for search-engine advertising constitute fourteen instances of unlawful bid-rigging as well as an overall, coordinated bid-rigging scheme. Bid-rigging in turn is a *per se* violation of Section 1. This matter is further explained below.

72.     The several agreements between 800-Contacts and its fourteen rivals concerning which among them would try to make sales in response to specified search queries constitute an unlawful market-allocation scheme, which is a second *per se* violation of Section 1. This matter is further explained below.

73.     800-Contacts used improper tactics to coerce the fourteen acquiescent competitors to assent to these anticompetitive, unlawful agreements. To force them to do so, 800-Contacts threatened to bring a succession of objectively baseless claims against them without regard to the probable outcome of these claims, and it actually litigated and lost one objectively baseless litigation against a fifteenth rival that refused to yield to its demands.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

74.     The trademark litigation that 800-Contacts threatened to bring and actually brought in one case was indeed "objectively baseless": in its cease-and-desist letters, it threatened to bring substantial trademark claims against any rival whose search-engine advertising appeared in response to any search query that mentioned any of 800-Contacts' trademarks. According to these cease-and-desist letters, any advertisement that so appeared constituted a violation of 800-Contact's trademarks – an absurd proposition that 800-Contacts never had any reasonable basis to make.

75.     If this theory of trademark infringement were correct, a company could register its trademarks, closely monitor Google analytics, and sue every other company whose ads were run in response to any query that mentioned its name or any of its other trademarks, even if the advertisements themselves in no way confused customers into incorrectly believing that the advertisers were authorized sellers of its products – which alone is the standard for determining whether an advertisement has infringed upon a trademark. This proposed application of trademark law, if accepted, would be oppressive, would impair the constitutional right of free speech, would not reasonably promote the proper aims of trademarks, and would encourage trademark trolls to engulf the courts in trademark litigation that did not protect anyone's trademarks, but only resulted in the senseless enrichment of trademark holders whose names happened to appear in internet search queries.

76.     The cost of litigating these points likely appeared prohibitive to 800-Contacts' rivals, each of which operated on low margins in order to make profits by selling contact lenses at low prices. With one exception, the smaller rivals chose not to oppose 800-Contacts' calculated threats to litigate baseless claims against them, but instead acquiesced in the above anticompetitive, unlawful agreements. The one rival that refused to yield was obliged to oppose the claims and incur costs to do so. Unsurprisingly, this hold-out rival prevailed at summary judgment and then again on appeal. See *1-800-Contacts, Inc. v. Lens.com, Inc.*, 722 F.3d 1229, 1256 (10th Cir. 2013).

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

77.    As for the fourteen rivals that acquiesced, 800-Contacts agreed to drop its claims against them in exchange for their acceptance of the above agreements, which in turn include the above anticompetitive provisions, which constitute two *per se* antitrust violations: (1) an unlawful conspiracy to rig bids; and (2) an unlawful conspiracy among direct competitors to allocate sales and suppress advertising. By these provisions, 800-Contacts succeeded at having its threatening rivals desist from competing against it in its designated "internet turf" – all internet queries that so much as mentioned its name or any of its other trademarks.

78.    **800-Contacts' Bid-Rigging Conspiracy**. As pled above, 800-Contacts' settlement agreements obliged each coerced rival to agree not to bid in online auctions to run paid advertisements that would appear in response to any online search query that mentioned 800-Contacts' name or any of its other trademarks (including all possible variations). 800-Contacts agreed reciprocally not to bid in online auctions for advertisements that would run in response to any online search query that mentioned any of its rivals' trademarks (including all possible variations).These agreements constitute unlawful bid-rigging, which is a *per se* violation of Section 1. See *United States v. Guthrie*, 814 F. Supp. 942, 950 (E.D. Wash. 1993), aff'd, 17 F.3d 397 (9th Cir. 1994) **(**bid rigging, which is a *per se* violation of Section 1, is "an agreement to interfere with competition for a transaction conducted by bid."); *United States v. Reicher*, 983 F.2d 168, 170 (10th Cir. 1992) (bid-rigging is an agreement between direct competitors to make or withhold bids or specified contract offers; it constitutes a *per se* violation of Section 1).

79.    The immediate victims of 800-Contacts' bid-rigging scheme were the search engines, which lost sales revenues, and prospective purchasers of contact lenses, who were deprived of information about the products that they wished to purchase as well as competition for their business among rival sellers of these products. Since there was a lack of competition for their business, they inevitably paid higher prices for contact lenses that they purchased from 800-Contacts than they

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-19-

would have done in a competitive market. That was the whole point.

80.     800-Contacts' rivals were also harmed even though they were coerced participants in the scheme, since they were forced to refrain from bidding to run ads in response to the many queries that mentioned 800-Contacts' well-known name, even though their ads were not likely to confuse users into believing that they were authorized by 800-Contacts to sell its products. For example, none of these rivals could bid to run internet advertising in response to a search query for "contact lenses offered by 800-Contacts or any other online seller."

81.     **800-Contacts' Scheme to Allocate Markets and Suppress Advertising**. As pled above, 800-Contacts' settlement agreements also obliged its rivals to take positive steps to ensure that their ads would not run in response to an online search query that mentioned any of 800-Contacts trademarks, such as a search for "contact lenses from 1-800-Contacts or any other online seller." 800-Contacts reciprocally agreed not to run its ads in response to any search query that included any of its rivals' trademarks. To give effect to these agreements, 800-Contacts and each rival specified the other's trademarks as "negative keywords," which as explained above serve as an online seller's instructions to search engines not to run its advertising whenever a designated negative keyword appears in a search query.

82.     By these provisions in the settlement agreements, 800-Contacts and fourteen of its direct competitors agreed that for specified search queries only one of them would provide advertising and thereby offer products. This practice therefore constituted a market-allocation scheme, which is a *per se* violation of Section 1. <u>See</u> *California ex rel. Harris v. Safeway, Inc.*, 651 F.3d 1118, 1137 (9th Cir. 2011) (market- allocation schemes among direct competitors are *per se* unlawful under Section 1); *Palmer v. BRG of Georgia, Inc.*, 498 U.S. 46, 49-50, 111 S. Ct. 401, 402-03 (1990) ("[A]greements between competitors to allocate territories to minimize competition are illegal.... Such agreements are anticompetitive regardless of whether the parties split a market within which both do business or whether they merely

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-20-

1    reserve one market for one and another for the other.")

2        83.    This practice also constitutes a conspiracy by direct competitors to

3    suppress advertising - a practice that has been challenged in cases such as *California*

4    *Dental Association v. Federal Trade Commission*, 526 U.S. 756, 119 S.Ct. 1604

5    (1999) and *Nat'l Soc. of Prof'l Engineers v. United States*, 435 U.S. 679, 98 S. Ct.

6    1355 (1978). In the present matter, the suppression of advertising was imposed only

7    to ensure that each competitor would advertise and sell products only in its own

8    designated "online territory." It was not even arguably used to further a claimed

9    benefit for consumers, such as ensuring that dental patients are not deceived

10   (*California Dental*) or that engineers refrain from quoting prices when bidding for

11   work so as to avoid the temptation to propose inexpensive but substandard structures

12   (*Professional Engineers*). The present case is therefore best regarded as a

13   market-allocation scheme that depends on the suppression of advertising, since the

14   sellers are online providers that principally make sales by running online

15   advertisements.

16       84.    800-Contact's market-allocation scheme deprived customers of

17   information about contact lenses that they otherwise would have received from rival

18   sellers' advertising. Even worse, the scheme deprived them of the benefits of

19   competition for their business. Whenever a prospective customer ran a covered search

20   query, he or she failed to receive advertising or competing offers from the excluded

21   rival providers.

22       85.    More generally, 800-Contact purposefully used its restraints of trade to

23   mislead customers into believing that it was a true discounter that offered contact

24   lenses at discount prices, when in fact it suppressed bidding, competition and the

25   dissemination of advertising precisely in order to ensure that true discounters would

26   be less likely or unable to display their offers to prospective customers.

27       86.    **Harm to Competition**. 800-Contacts' bid-rigging scheme and its

28   scheme to allocate sales and suppress advertising harmed competitive processes in the

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

following relevant markets: (1) the contact lense markets – *i.e.*, the market for the sale of contact lenses in the United States as well as the submarket for the online sale of contact lenses in the United States; and (2) the market for search-engine advertising in the United States.

87.     In the contact lens markets, 800-Contacts used the above-pled practices to suppress competition for sales; this in turn permitted it to charge supracompetitive prices for its contact lenses – *i.e.*, prices that were higher than those that it could have charged in a competitive market without losing substantial sales to rivals. That was the whole point of its conduct and anticompetitive schemes.

88.     Although 800-Contacts' trade restraints did not affect every prospective customer and instead reached only those that ran specified search queries, these trade restraints reached enough prospective customers so that 800-Contacts could protect itself sufficiently from competition in order to maintain supracompetitive prices and/or practice price discrimination by charging supracompetitive prices to those users who arrived at its site after using one of the specified search queries. Moreover, the general effect of these trade restraints was to limit competition on price and quality among rival online sellers of contact lenses - a circumstance that by itself permitted 800-Contacts to charge supracompetitive prices to all of its customers.

89.     At a later stage of these proceedings, Plaintiff will furnish econometric evidence that 800-Contacts charged supracompetitive prices in the contact lens markets, and she will provide an econometric quantification of the probable amount of the overcharges (the amount by which 800-Contacts charged prices that exceeded competitive prices).

90.     In the above contact lens markets, 800-Contacts also suppressed advertising, which is the dissemination of information about products and a form of output that is useful to consumers in these markets.

91.     800-Contacts therefore restricted output in the contact lens markets by charging supracompetitive prices, which inevitably restrict output, and also by

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-22-

suppressing advertising and the dissemination of information about products, which is a form of output.

92.    In the contact lens markets, 800-Contacts also used its above-pled practices to impair or suppress (1) competition for sales and (2) its rivals' ability to offer financing terms that it did not offer, alternative services that it did not offer, and more responsive and timely service than it offered. In this manner, 800-Contacts further restricted output in the contact lens markets by means of its above-pled practices.

93.    800-Contacts' challenged practices therefore harmed competitive processes in the contact lens markets: these practices resulted in the imposition of supracompetitive prices and the further restriction of output by other means.

94.    800-Contacts' challenged practices also harmed competitive processes in the market for search-engine advertising in the United States. In this market, 800-Contacts used the above-pled practices in order to depress the amounts it and other online sellers of contact lenses paid to search engines to run their advertisements in response to specified search queries, since these direct competitors agreed not to bid against one another to run their respective advertisements whenever the name or other trademark of one of them appeared in a search query. The above-pled practices thus suppressed all rival bids to run search-engine advertisements under specified circumstances.

95.    Not only did these competitors agree not to bid against one another, but they further agreed that they would not run competing advertising for specified internet search queries.

96.    By preventing its rivals from bidding for or showing internet advertising in response to specified search queries, 800-Contacts restricted the output of advertising in the market for search-engine advertising. Users who ran search queries received less advertising and information than they would have done in a competitive market for search-engine advertising.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

97.   800-Contacts' agreements with fourteen of its direct competitors therefore harmed competitive processes in the national market for search-engine advertising by suppressing competitive bidding to run search-engine advertisements and by suppressing search-engine advertising.

98.   800-Contacts' challenged practices therefore harmed competition in the relevant markets placed in issue in the present case. Plaintiff need not make any such showing to prevail on her single cause of action, since 800-Contacts' challenged practices should be condemned as *per se* violations of Section 1, but Plaintiff has pled this claim under three alternative standards of review and is prepared if necessary to prove harm to competitive processes in each of the above markets.

99.   **Plaintiff's Antitrust Injuries**. As pled more fully below, Plaintiff and each member of the proposed class suffered antitrust injuries in proximate consequence of the anticompetitive character, purpose, and effect of 800-Contacts' bid-rigging scheme and scheme to allocate sales and suppress advertising: they each paid supracompetitive prices for contact lenses that they purchased online from 800-Contacts within the past four years; and they each were deprived of consumer choice, which is a form of antitrust injury. These matters are pled more fully in the following section of this complaint.

## V. CLASS-ACTION ALLEGATIONS

100.   Plaintiff re-pleads and incorporates by reference each of the preceding allegations.

101.   Plaintiff made online purchases of contact lenses from 800-Contacts within the past four years. For at least one of these purchases, she recalls having run a search query to look for online sellers of contact lenses. She was misled by 800-Contacts' online advertising and promotions to believe that 800-Contacts was a bona fide discounter that offered the best possible prices for contact lenses and did not realize that it used the above trade restraints to charge supracompetitive prices, restrain competition, and suppress its rivals' dissemination of their lower prices and

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-24-

alternative offers and services.

102.   Had 800-Contacts not employed the above-pled restraints of trade, it would have been obliged to charge competitive rather than supracompetitive prices for the contact lenses that it sold to Plaintiff. She has been harmed because she paid to 800-Contacts the difference between its supracompetitive prices and competitive prices.

103.   In addition, if 800-Contacts had not employed the above-pled restraints of trade, Plaintiff likely would have been exposed to paid advertising by rival providers when she ran the above search query. Since she was not exposed to this advertising, she was deprived of a corresponding opportunity to consider the rival providers' competing products and services. This loss of choice, imposed by 800-Contacts' above-pled restraints, is a form of antitrust injury and harm to Plaintiff. See *Glen Holly Entm't, Inc. v. Tektronix Inc.*, 343 F.3d 1000, 1011 (9th Cir.), opinion amended on denial of reh'g, 352 F.3d 367 (9th Cir. 2003) ("One form of antitrust injury is coercive activity that prevents its victims from making free choices between market alternatives.") (internal quotation omitted).

104.   Plaintiff and all other similarly situated persons have been directly harmed by the anticompetitive character, purpose, and effect of 800-Contacts' bid-rigging conspiracy and scheme to allocate sales and suppress advertising. Plaintiff, who belongs to the proposed class, now seeks to represent all legal persons located in the United States who during the past four years overpaid for contact lenses that they purchased online from 800-Contacts because of its bid-rigging conspiracy and/or its related scheme to allocate sales and suppress advertising.

105.   By suppressing its rivals' advertising and ability to make sales to customers that ran specified search queries, 800-Contacts was able to charge higher prices to these customers than it would have been able to do had it faced competition from its rivals for these sales. At a later stage of these proceedings, Plaintiff will provide econometric and other expert evidence of the amounts that 800-Contacts

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-25-

overcharged for these sales because of its above-pled antitrust violations.

106. Because of 800-Contacts' above-pled anticompetitive practices, Plaintiff and each member of the proposed class overpaid for contact lenses that they purchased from 800-Contacts during the stated period. It is possible to develop econometric models that can furnish reasonable estimates of the amounts of these overcharges and to provide appropriate *pro rata* compensation to each member of the proposed class. Because of 800-Contacts' above-pled anticompetitive practices, Plaintiff and each member of the proposed class were deprived of consumer choice and alternative promotions of products and services that were different from, better than, and/or less expensive than those offered by 800-Contacts. Unlike 800-Contacts, some online sellers of contact lenses were bona fide discounters that offered or systematically matched the lowest available prices for these products, but 800-Contacts was able to prevent them from making themselves known to prospective customers by its above-pled restraints of trade.

107. Plaintiff proposes to litigate the present case as a class-action because her claim against 800-Contacts satisfies the required criteria for litigating a claim as a class-action. These criteria are set forth at Federal Rule of Civil Procedure 23 and are addressed directly below.

108. Pursuant to Rule 23(b)(2) and (b)(3) of the Federal Rules of Civil Procedure, Plaintiff now brings a proposed class-action on behalf of herself and the following proposed class of similarly situated individuals:

> All persons in the United States who made online purchases of contact lens products from 800-Contacts for personal and household use and not for resale from September 21, 2012 until the date on which class notice is given.

> Excluded from the proposed class is Defendant (800-Contacts), any entity in which Defendant has a controlling interest or that has a controlling interest in Defendant, and Defendant's legal representatives, assignees, and successors. Also excluded are the judge and magistrate judge to whom this case is assigned and any member of the judge's immediate family and the magistrate judge's immediate family.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-26-

109.   **Numerosity**. The proposed class consists of many thousands of persons. It is so numerous that joinder of all members is impracticable.

110.   **Common Issues Predominate.** Each member of the proposed class claims that 800-Contacts employed unlawful restraints of trade in violation of Section 1, and that by so doing it overcharged each member for contact lenses that it sold to them and also deprived each member of consumer choice. The principal issues of fact and law that arise from this claim are common to the entire class, and these issues predominate. Any issue of fact or law that is peculiar to individual members is merely ancillary to the common, predominant issues.

111.   The common issues of fact and law that are predominant in this case include the following:

(1)   Were 800-Contacts' several agreements with its rivals unlawful *per se* under Section 1 because each agreement obliged each rival to refrain from bidding to run search-engine advertising in response to any search query that included mention of 800-Contacts' name or any of its other trademarks?

(2)   Were 800-Contacts' several agreements with its rivals unlawful under Section 1 because each agreement required each rival to withhold its search-engine advertising from any response given to a search query that included mention of 800-Contacts' name or any of its other trademarks?

(3)   Using a "quick-look" analysis, were 800-Contacts' several agreements with its rivals unlawful restraints of trade in violation of Section 1?

(4)   Under the "Rule of Reason," were 800-Contacts' several agreements with its rivals unlawful restraints of trade in violation of Section 1?

(5)   By approximately how much was 800-Contacts able to overcharge for contact lenses that it sold in the United States during the past four years because of its agreements with its rivals? How should these overcharges be allocated among each member of the proposed class?

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

112.   800-Contacts has engaged in a common course of conduct toward Plaintiff and members of the proposed class.  The common issues arising from this conduct that affect Plaintiff and class members predominate over any individual issues.

113.   **Plaintiff's Claim Is a Typical Claim**. Plaintiff is a direct purchaser who within the past four years made online purchases of contact lenses from 800-Contacts. She overpaid for these contact lenses by paying supracompetitive prices for them after conducting an online query for contact lenses, and she was deprived of consumer choice and alternative offers of products and services that were different from, better than, and/or less expensive than those offered by 800-Contacts. She therefore has a typical claim that is essentially identical to the claim held by of each member of the proposed class, and her claim depends on the adjudication of the above-listed common issues of fact and law.

114.   **Adequacy**. Plaintiff will fairly and adequately protect the interests of the proposed class. Plaintiff has retained competent, capable attorneys who have significant experience in antitrust litigation as well as complex and class-action litigation, including consumer class-actions. Plaintiff and her counsel are committed to prosecuting this action vigorously on behalf of the proposed class and have the financial resources to do so. Neither Plaintiff nor her counsel have interests that are contrary to, or in conflict with, those of the proposed class.

115.   Plaintiff is therefore an appropriate representative of the proposed class members who can litigate the present antitrust challenge proficiently on behalf of the proposed class.

116.   **Superiority**.  A class-action is superior to other available methods for the fair and efficient adjudication of the present controversy. Adjudication of the common issues of fact and law in a single action will promote judicial economy, nor would it be practical to oblige each class member to litigate his or her claim independently. Doing so would be cost-prohibitive and so would never occur; but if

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-28-

each claimant were to litigate his or her claim separately, these litigations would necessarily result in duplicative procedures and might result in inconsistent adjudications of identical issues of fact and law.

117.   **Injunctive and Declaratory Relief Appropriate**. Plaintiff's proposed class-action is also appropriate under Fed. R. Civ. P. 23(b)(2) because 800-Contacts has committed the same legal wrong against all members of the proposed class, and on behalf of all class members Plaintiff seeks final injunctive relief against 800-Contacts in order to prevent it from persisting in its anticompetitive conduct.

118.   **Arbitration**. On its website, 800-Contacts posts a notice of its purported requirement that its customers must submit to binding arbitration any claim that any of them might have in connection with the customer's purchase of any product from 800-Contacts. During the four-year period that preceded the filing of this complaint, 800-Contacts did not require its customers to indicate their assent to this purported arbitration clause or to its other posted terms of sale. There was therefore never any meeting of the minds between 800-Contacts and its customers that any dispute between them must be arbitrated.

119.   800-Contacts' purported arbitration clause that appears on its website is unenforceable under federal law because none of its customers was required to take any action to express his or her assent to it. See, e.g., *Nguyen v. Barnes & Noble Inc*., 763 F.3d 1171, 1175-1176 (9th Cir.2014); *Knutson v. SiriusXM Radio Inc*., 771 F.3d 559, 565 (9th Cir.2014); *Specht v. Netscape Commc'ns Corp*., 306 F.3d 17, 38 (2d Cir.2002).

120.   Regardless, 800-Contacts failed to disclose its arbitration clause in a reasonable manner to its customers, each of whom can therefore be said to be "surprised" by its existence. In addition, each customer stood in a greatly inferior bargaining position in relation to 800-Contacts. Lastly, the substantive provisions of the arbitration clause are inequitable and oppressive: they are intended to deprive common victims of the same wrongful business practices from obtaining appropriate

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-29-

redress by means of class-action relief, which in many instances, including the present one, is the only practicable, viable manner in which any of them can obtain any redress at all for such practices, since the cost, delay and difficulty of privately arbitrating each customer's separate claim would be prohibitive. For these reasons, 800-Contacts' notice of a purported arbitration clause is unconscionable and should be declared contrary to public policy and therefore unenforceable.

**VI. FIRST CAUSE OF ACTION**
**(Unlawful Restraints of Trade)**
**(15 U.S.C. §1)**

121.   Plaintiff re-pleads and incorporates by reference each of the preceding allegations.

122.   By orchestrating and enforcing the above-pled agreements with its rivals to suppress and manipulate bidding for online advertisements, 800-Contacts has restrained trade and interstate commerce in the United States. Its agreements with its rivals to allocate and restrict bidding are intended to restrain trade in an anticompetitive manner and foreseeably have had this effect.

123.   As implemented and enforced by 800-Contacts, the above-pled agreements on bidding between 800-Contacts and fourteen of its direct competitors constitute restraints of trade that are unlawful *per se* under Section 1.

124.   By orchestrating and enforcing the above-pled agreements with its rivals to allocate sales and suppress online advertising, 800-Contacts has restrained trade and interstate commerce in the United States. Its agreements with its rivals to allocate sales and restrict online advertising are intended to restrain trade in an anticompetitive manner and foreseeably have had this effect.

125.   As implemented and enforced by 800-Contacts, 800-Contacts' agreements with fourteen of its direct competitors on sales-allocation and the suppression of advertising constitute restraints of trade that are unlawful *per se* under Section 1.

//

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-30-

126.   800-Contacts' above-pled restraints of trade each constitute a *per se* violation of Section 1. Harm to competition is therefore presumed without any need to define the relevant markets in which these trade restraints were imposed, nor is there any need to show how these trade restraints have harmed competitive processes in any of the relevant markets.

127.   Regardless, 800-Contacts' restraints of trade have demonstrably and significantly undermined competitive processes in three properly defined markets – the market for the sale of contact lenses in the United States; the submarket for the online sale of contact lenses in the United States; and the market for search-engine advertising in the United States. In each of these markets, 800-Contacts' restraints of trade have purposefully and foreseeably undermined ordinary competitive interplay, as is pled fully above. In the contact lens markets, 800-Contacts has used these restraints to exclude and impair the operations of its rivals so that it can subject its increasingly captive customers to higher prices and less accommodating service than it could offer in competitive markets, and it has also restricted output by suppressing advertising and the dissemination of information about contact lenses and by preventing its rivals from offering lower prices, different products, alternative financing terms and various services that it does not or cannot offer. In the market for search-engine advertising, 800-Contacts has orchestrated collusive bidding and suppressed advertising in furtherance of its market-allocation scheme. It has thus restricted the output of advertising in this market and thereby deprived customers of advertising and information about products and services.

128.   Therefore, 800-Contacts' restraints of trade are unlawful under both the "quick-look" standard of review and the "Rule of Reason."

129.   Plaintiff and all of the members of the proposed class have suffered antitrust injuries in proximate consequence of the anticompetitive purpose, effect and character of each of 800-Contacts' anticompetitive agreements. These losses can be quantified.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-31-

130.   More specifically, Plaintiff and all members of the proposed class have overpaid for contact lenses that they each purchased within the past four years from 800-Contacts. Plaintiff will demonstrate the probable amount of these overcharges at a later stage of these proceedings. In addition, Plaintiff and each member of the proposed class have been deprived of information about contact lenses, competition for their business, and the offer of alternative and better prices, products, and services.

131.   800-Contacts has employed its anticompetitive practices in interstate commerce and in a manner that has affected interstate commerce. Its challenged conduct is therefore subject to review under the antitrust laws of the United States.

WHEREFORE, Plaintiff seeks redress for the harm that she and each member of the proposed class have suffered because of 800-Contacts' violation of the antitrust laws of the United States.

## VII. PRAYER FOR RELIEF

Plaintiff now prays to this Court for the following orders and redress, to which she is entitled under 15 U.S.C. §§ 15 and 26 and also under Fed. R. Civ. P. 23:

1.   Certification of the proposed class.

2.   Appointment of Plaintiff as the class representative and the Law Offices of William Markham, P.C. and the Law Offices of Ronald A. Marron, a Professional Corporation as class counsel or interim class counsel.

3.   Costs for giving required notices to class members, and all associated costs.

4.   Compensatory damages, trebled under 15 U.S.C. § 15.

5.   Pre-judgment interest, as authorized by 15 U.S.C. § 15.

6.   Injunctive and declaratory relief, as authorized under 15 U.S.C. § 26.

7.   Costs of suit, including reasonable attorneys' fees, as authorized by 15 U.S.C. §§ 15 and 26.

8.   Such other relief as the Court deems appropriate and just.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

## VIII. DEMAND OF JURY TRIAL

So far as the law allows, Plaintiff demands that a jury of her peers try her claim against 800-Contacts.

DATED:  September 21, 2016     Respectfully submitted,

/s/ William Markham

By:     William A. Markham,
        LAW OFFICES OF WILLIAM MARKHAM, P.C.
        Attorneys for Plaintiff, Pam Stillings.

PLAINTIFF'S CLASS-ACTION COMPLAINT FOR UNLAWFUL RESTRAINTS OF TRADE, ETC.

-33-